

800.211.DEPO (3376)
EsquireSolutions.com

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF MISSOURI

3             SOUTHEASTERN DIVISION

4

5   EDWARD KOELLER,                    )

6   individually and on behalf        )

7   of all others similarly           )

8   situated,                         )

9          Plaintiff,                  )

10                                     )

11  v.                                 )   Case No.

12                                     )   4:23-cv-00319-SEP

13  CYBELANGEL USA, INC,               )

14          Defendant.                 )

15

16

17

18                  DEPOSITION OF

19                  EDWARD J. KOELLER

20                  JANUARY 30, 2024

21                  11:00 a.m.

22                  Remote Proceeding

23       Linda P. Gove, CCR; 4716-1949-7728-4096.

24

25



```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF, EDWARD KOELLER AND ALL OTHERS

 4    SIMILARLY SITUATED:

 5    SAMUEL J. STRAUSS, ESQ.

 6    TURKE & STRAUSS, LLP

 7    613 Williamson Street

 8    Suite 201

 9    Madison, Wisconsin 53703

10    608-237-1775

11    Email:  sam@turkestrauss.com

12

13    FOR THE DEFENDANT, CYBELANGEL USA, INC.:

14    JAMES M. RULEY, ESQ.

15    PRO HAC VICE

16    WATSTEIN TEREPKA, LLP

17    1055 Howell Mill Road

18    8th Floor

19    Atlanta, Georgia 30318

20    404-782-0695

21    Email:  jruley@wtlaw.com

22

23    ALSO PRESENT:

24          Andrew Gunem, Esq.

25
```



1                    INDEX TO EXAMINATION

2

3   WITNESS: EDWARD KOELLER

4

5   EXAMINATION                                    PAGE

6   By Mr. Ruley                                   5

7

8                    INDEX TO EXHIBITS

9

10  For the Defendant:

11  Exhibit#        Description              Page

12  Exhibit 1     Complaint                  29

13  Exhibit 2     Plaintiff's Discovery      32

14                Responses

15  Exhibit C     Subpoena                   43

16

17

18

19

20

21

22

23

24

25



```
 1                    PROCEEDINGS

 2          THE VIDEOGRAPHER:  Okay.  This is file one to

 3   the videotaped deposition of Edward J. Koeller in the

 4   matter of Edward J. Koeller versus CybelAngel USA,

 5   Inc. being heard before the U.S. District Court,

 6   Eastern District of Missouri, Southeastern Division,

 7   Case Number 4:23-cv-319.

 8          This deposition is being held via Zoom

 9   conferencing with all parties appearing remotely on

10   January 3rd -- 30th, 2024.  The time is approximately

11   11:05 a.m.  The court reporter is Linda Gove, and my

12   name is Heidi Sarsony, the videographer.

13          Counsel, please introduce yourselves and your

14   affiliations, and then the witness will be sworn.

15   Thank you.

16          MR. RULEY:  I'm James Ruley, and I'm here on

17   behalf of CybelAngel.

18          MR. STRAUSS:  I'm Sam Strauss from the law

19   firm of Turke and Strauss.  I'm here on behalf of Mr.

20   Koeller and the putative class.

21          THE COURT REPORTER:  Good morning, Mr.

22   Koeller.  Could you raise your right hand for me,

23   please.

24   WHEREUPON,

25                          EDWARD KOELLER,
```



```
 1   Having been called as a witness, being duly sworn,
 2   testified as follows:
 3                        EXAMINATION
 4   BY MR. RULEY:
 5        Q   Good morning, Mr. Koeller.  My name is James
 6   Ruley as I just mentioned, and I'm here on behalf of
 7   CybelAngel.
 8             Do you know why you're here today?
 9        A   Yes.
10        Q   And why is that?
11        A   To give a deposition.
12        Q   And it's your understanding that that
13   deposition is in this lawsuit that you brought against
14   CybelAngel; is that correct?
15        A   Yes.
16        Q   And Mr. Koeller, have you ever been deposed or
17   given testimony in any legal proceeding before?
18        A   No.
19        Q   Well, we're going to go over some ground rules
20   to make sure that you understand the process.  And I'm
21   sure that Sam has already explained this to you, but I
22   will as well just to make sure that we're on the same
23   page.  Because in some ways, obviously, this -- this
24   deposition is very formal, but fundamentally, this is
25   just a chance for me to ask you questions about this
```



1  lawsuit that you filed.

2          However, just like testifying in a court of

3  law, you are under oath, and you must provide truthful

4  testimony.  Do you understand that?

5      A    Yes.

6      Q    And one thing you'll notice that your

7  testimony is being taken down steno graphically and by

8  video.  And this video may be played at trial for the

9  purposes of impeachment, which means that if you

10  testify about something today and you were to testify

11  differently at trial, or if there's a document or

12  other witness testimony establishing that what you

13  said is incorrect or untruthful, we can use this video

14  to impeach your credibility.

15          Do you understand that?

16      A    Yes.

17      Q    And the court reporter is transcribing

18  everything that's being said today, and that means a

19  couple of things for us.  The first of those is that

20  we have to provide verbal answers.  So in normal

21  conversation, we often respond to questions by shaking

22  our head or gesturing with our hands or other

23  non-verbal responses.  But during this deposition, we

24  have to use verbal responses.

25          The same thing with saying things like uh-huh



1  or uh-uh.  While it might be clear in normal

2  conversation that we're indicating a yes or no by one

3  of those responses, that won't be clear on the written

4  record.  And so we need to make sure that we provide

5  those verbal answers.

6        And if I correct you at any point in time if

7  you're not using a verbal answer, please don't think

8  I'm being rude.  We're just trying to preserve the

9  record.  Does that make sense?

10     A   Yes.

11     Q   And during this deposition, I'll ask you a lot

12  of questions that can be answered with a yes or no.

13  Please answer them with a yes or no if it's possible,

14  and then provide whatever explanation you feel may be

15  necessary.  And your attorney will have a chance to

16  ask you follow-up questions at the end of my

17  examination if you feel that you haven't been able to

18  get your whole story out.

19        I also want to make sure that we don't talk

20  over each other during this deposition.  So please let

21  me finish my question before you start responding, and

22  I will strive to do the same, to let you finish your

23  full answer before I ask another question -- before I

24  ask another question.  Is -- is that fair?

25     A   Yes.



1      Q   And if you're ever unsure of what I'm asking

2   during this deposition, please let me know and I will

3   try to rephrase or ask you a better question.  I will

4   assume, however, that you understand my question

5   unless you tell me otherwise.  Is that fair?

6      A   Yes.

7      Q   Now, this deposition is not, you know, a test

8   to see how long we can go at a given spot, you know,

9   for a given amount of time.  I -- I do suspect it will

10   be slightly longer than 45 minutes, although I will

11   try to get through this as -- as quickly as possible.

12          My plan is to take a break roughly once every

13   hour during this deposition.  But if you feel like you

14   need a break at any time, you just let me know and we

15   can take a quick break for the restroom or to stretch

16   your legs or whatever you need.

17          I only ask that if you do ask for a break, you

18   finish answering any question that I may have just

19   asked before we take that break.  Does that sound

20   okay?

21      A   Yes.

22      Q   Now, occasionally, your attorney may object or

23   maybe more often than occasionally, to a question that

24   I might ask.  But unless your attorney tells you not

25   to answer, you must answer my question.



```
 1              And along the same lines, please ask me rather
 2   than your own attorney for clarification, definitions,
 3   or explanations of any words, questions, or documents
 4   that I may present to you during the course of this
 5   deposition.
 6              Now, because this is a virtual deposition,
 7   we're not in the same room obviously, and so I'll --
 8   I'll ask you a couple questions that would -- would be
 9   very apparent to me if -- if we were there in the
10   room.  But do you have any documents in front of you?
11        A    No.
12        Q    And do you have any other tabs open on your
13   computer other than for -- for the purposes of -- of
14   taking this deposition, such as the Zoom link?
15        A    No.
16        Q    And is anyone else in the room with you?
17        A    No.
18        Q    Throughout this deposition, I'll refer to the
19   defendant, CybelAngel, USA, Incorporated as
20   CybelAngel.  If I use that designation, will you
21   understand that I'm referring to the defendant in this
22   lawsuit when I -- when I use that shorthand?
23        A    Yes.
24        Q    Is there any reason you can think of that you
25   can't provide me with complete and truthful testimony
```



```
 1  today?

 2       A    No.

 3       Q    And are you taking any medications that may

 4  impact your memory or otherwise affect your ability to

 5  testify?

 6       A    No.

 7       Q    You've already stated your full name for the

 8  record.  Are there any other names that you've gone by

 9  such as a nickname or alias?

10       A    I also go by Ed.

11       Q    Anything else?

12       A    No.

13       Q    And I'm saying your last name correctly.  It's

14  Koeller; correct?

15       A    It is actually Koeller.  The O is silent.

16       Q    Koeller.  Thank you for -- for clarifying that

17  for me.  It's a terrible feeling to realize you've

18  been calling someone by the wrong last name for

19  however long you're talking to them.  Thank you.

20  Thank you, Mr. Koeller.

21            How old are you, Mr. Koeller?

22       A    45 years old.

23       Q    And what's your date of birth?

24       A    July 3, 1978.

25       Q    And where do you currently reside?
```



```
1      A    9821 Vicksburg Siege Court, St. Louis,
2  Missouri, 63123.
3      Q    And how long have you lived there?
4      A    About nine years.
5      Q    Does anyone live there with you?
6      A    Yes.
7      Q    And who lives there with you?
8      A    My wife and my two children.
9      Q    And what is your wife's name?
10     A    Julie Koeller.
11     Q    And are your two children both under the age
12 of 18?
13     A    Yes.
14     Q    Mr. Koeller, what's your highest level of
15 education?
16     A    High school.
17     Q    Do you have any -- any educational degrees or
18 other professional certifications?
19     A    No.
20     Q    Okay.  And are you presently employed?
21     A    Yes.
22     Q    And where are you presently employed at?
23     A    Ameren.
24     Q    And can you tell me a little bit about what
25 Ameren does as a company?
```



```
 1      A    Yes.   They are an energy company that provides
 2  electric generation, transmission distribution, as
 3  well as some natural gas transmission.
 4      Q    And how long have you worked at Ameren?
 5      A    22 years.
 6      Q    And what's your current job title?
 7      A    Cyber security vulnerability management
 8  engineer.
 9      Q    Have you always had that title?
10      A    No.
11      Q    Can you explain for me briefly the -- the
12  different positions you've had in the 22 years you've
13  been at Ameren?
14      A    Sure.   I started off doing user provisioning.
15  I then switched over into cyber security role as a
16  cyber security analyst doing forensics and incident
17  response.   Switched more into incident response
18  dedicated role.   And then switched over into
19  vulnerability management role as an analyst.   And then
20  got promoted to an engineer.
21      Q    So how long of the 22 years you've been at
22  Ameren, how many of those years have you been in a
23  cybersecurity role?
24      A    17.
25      Q    And can you explain to me in -- in layman's
```



1   terms, please, what a cybersecurity vulnerability

2   management engineer does?

3        A   Sure.   This role scans the network and uses

4   other tools to try to find vulnerabilities and work

5   with stakeholders and other teams to mitigate the

6   vulnerabilities before cyber security hackers can.

7        Q   Is your job -- and -- and apologies because

8   this isn't my field, so if this is a -- a very basic

9   question, I'll just show my ignorance -- but is your

10  job internal facing, meaning you're assessing the

11  company's security internally, or externally facing,

12  in other words, handling security for -- for customers

13  of Ameren?

14       A   It is internally facing.   We only do

15  vulnerability management for Ameren.

16       Q   And can you explain to me how you spend most

17  of your time at work?   In other words, do you spend a

18  lot of your time traveling or working on projects on

19  your computer, on Zoom meetings, on the phone?   Can

20  you give me just a little bit of understanding of --

21  of how you spend your time at work?

22            MR. STRAUSS:   Object to the form of the

23  question.

24            You may answer it, Mr. Koeller -- Koeller,

25  excuse me.



```
 1              THE WITNESS:  I'm sorry, Sam, you said I may

 2   answer it?

 3              MR. STRAUSS:  Yeah, you may answer it.

 4              THE WITNESS:  Okay.  Thank you.  I spend most

 5   of my time in Teams meetings working internally with

 6   other teams inside Ameren.  I spend time working with

 7   our tools to discover vulnerabilities.  And I spend

 8   time researching ways to mitigate those

 9   vulnerabilities through research web browsing.

10   BY MR. RULEY:

11      Q    Where are you physically located when you

12   work?

13      A    Most of the time, I work from home.  We do

14   sometimes go in the office one day a week.

15      Q    And when did you -- when did you begin that

16   working from home most of the time and -- and in

17   office one day a week?

18      A    We began working from home during the

19   pandemic.  That's when I started.  The one day a week

20   was maybe a year ago.  It is optional, so not required

21   to be in.  But do go in just to see other teammates.

22      Q    I -- I understand.  So -- and -- so if I'm

23   understanding your testimony correctly, you began

24   working from home full-time in -- in 2020, probably

25   about March 2020; is that correct?
```



```
1        A   I believe it was actually -- yeah, I believe
2   it was February, but around that timeframe, yes.
3        Q   And then you began being back in the office
4   optionally one day a week early 2023 give or take?
5        A   Yes.
6        Q   How many employees at Ameren work in cyber
7   security?  And I -- I'm just looking for a -- a rough
8   number if you know.
9        A   120.
10        Q   Do you work with a -- a team of people within
11  cyber security, or do you primarily work on your own?
12        A   I work with a team of people.
13        Q   And how big is that team of people?
14        A   Four, including myself.
15        Q   And what are their names?
16            MR. STRAUSS:  Object to the -- object to the
17  form of coun -- question.  Counsel, I just worry that
18  this is becoming harassing, and I worry that he's
19  going to be sharing confidential information about
20  security at his employer.  And it seems untethered to
21  the claims and defenses in this case.
22            MR. RULEY:  Oh, I think it's -- I think it's
23  relevant to the extent we're exploring an -- an EBR
24  defense.  And I think to the extent we're worried
25  about confidentiality, we -- we can, of course, have
```



```
 1   testimony subject to the Protective Order.

 2           MR. STRAUSS:  Yeah.  And -- and you'll agree,

 3   Counsel, that any of this testimony about Ameren, I --

 4   I can appreciate potentially how there -- there could

 5   be relevance maybe as it relates to EBR, but you'll

 6   agree that any of this testimony regarding Ameren can

 7   be designated as confidential.

 8           MR. RULEY:  Yeah.  I don't think we would

 9   object to that.

10           MR. STRAUSS:  Okay.  So by you don't think

11   you'll object to that, you -- you would agree?

12           MR. RULEY:  That -- that's right.

13           MR. STRAUSS:  Okay.  All right.  I just -- I

14   don't -- I don't want a witness getting in trouble

15   with their employer, you know.

16           MR. RULEY:  I -- I understand.

17           MR. STRAUSS:  Yeah.  So okay.  Mr. Koeller,

18   you can answer the question.  And -- and we can

19   certainly ask Linda to repeat it back if you have

20   forgotten.

21           THE WITNESS:  I do remember the question.

22   Sam, I do have a question.  Can I ask you a question?

23           MR. STRAUSS:  So you -- you actually can't.

24   And I -- I -- unfortunately, no.  If we need to take a

25   break, if you're worried about your testimony, we can
```



```
 1   definitely go off the record and take a break.  But --
 2   but, no, you can't ask me a question on the record.
 3            THE WITNESS:  Okay.  I just want to state I
 4   have a concern -- concern because that is people --
 5   this is a public record.  People can target
 6   cybersecurity people at Ameren.  It's a common
 7   practice for cyber -- for attackers to do that.  So we
 8   usually do not -- company policy, we do not provide
 9   that information.
10            MR. RULEY:  And -- and I think -- I think what
11   Sam and I have -- have agreed to is that any testimony
12   that you give on this point would be subject to the
13   confidentiality Order in this case, which means that
14   none of it would be public record.
15            MR. STRAUSS:  Yeah.  Mr. Koeller, that said, I
16   -- at a certain point, if the testimony or if the line
17   of questions continue to explore Ameren, then we can
18   stop the deposition and, of course, seek the Court's
19   direction.  But -- but that -- but that's right, this
20   won't be public record.  We -- we agree that this will
21   be designated as confidential.
22            And then the parties -- if any part of it
23   needs to be used, the parties will negotiate that, and
24   we'll make sure to include you in those negotiations
25   so you would be aware.  But -- but I don't -- I don't
```



```
 1   have a concern.  I suspect we'll negotiate that just

 2   fine.

 3            (Part of the testimony on page 18, lines 4-10

 4   was marked confidential, excerpted, and bound

 5   separately.)

 6

 7

 8

 9

10

11       Q    Thank you.  And you mentioned that you are in

12   a lot of Teams meetings; is that correct?

13       A    Yes.

14       Q    Do you communicate with your co-workers in --

15            MR. RULEY:  Sorry, what was that, Sam?

16            MR. STRAUSS:  I didn't say anything.

17            MR. RULEY:  Oh, okay.  I'm -- I'm sorry.  I

18   must have been getting feedback.

19   BY MR. RULEY:

20       Q    Are there other ways you communicate with your

21   co-workers besides Teams?

22       A    No.

23       Q    You never communicate with them through, for

24   example, email?

25       A    Oh, yes, we do email, yep.
```



```
 1        Q    And do you ever see them in person when you go
 2   into the office?
 3        A    Yes.
 4        Q    Do you ever talk with them on the phone?
 5        A    Yes.
 6        Q    Do you ever text with them?
 7        A    Yes.
 8        Q    Any other ways you might communicate with
 9   them?
10        A    No.
11        Q    Do you have a telephone number paid for
12   exclusively by Ameren?
13        A    Can you define exclusively?
14        Q    How would you define exclusively?
15        A    That they pay 100 percent for my phone.
16        Q    So with that definition, do -- do you have a
17   telephone number paid for exclusively by your
18   employer, Ameren?
19        A    No.
20        Q    Do you have business cards for your work?
21        A    No.
22        Q    So when you speak to your co-workers by
23   telephone, it's not on a number paid for exclusively
24   by your employer; is that correct?
25        A    Can you repeat the question, please?
```



```
 1              MR. RULEY:  Linda, do you mind reading it
 2   back?
 3              THE COURT REPORTER:  Sure.  Hang on just a
 4   second, okay?
 5              MR. RULEY:  Yeah, no problem.  Thank you.
 6              (The previous question was read back as
 7   requested.)
 8              THE WITNESS:  Can you rephrase the question?
 9   BY MR. RULEY:
10      Q    Sure.  So you testified that sometimes you
11   speak with your co-workers by phone call or text; is
12   that correct?
13      A    Yes.
14      Q    And so when you speak with your co-workers by
15   phone call or text, you're not using a telephone
16   number paid for exclusively by your employer; is that
17   correct?
18      A    I'm sorry.  I'm still struggling with this
19   one.  I think you're -- are you assuming that phone
20   calls happen on a physical device and not through
21   Teams?
22      Q    Is it your testimony that you only speak with
23   your -- that -- I thought your testimony was that you
24   spoke with your co-workers over Teams and also by
25   phone call; is that correct?
```



```
 1       A    Yes.

 2       Q    And those phone calls are different than

 3  communicating over Teams; correct?

 4       A    Yes.

 5       Q    And when you text with your co-workers, that's

 6  different than communicating with them over Teams; is

 7  that correct?

 8       A    Yes.

 9       Q    So when you are speaking with your co-workers

10  by phone call, you're communicating with them via a

11  number that is not paid for exclusively by your

12  employer; is that correct?

13       A    Yes.

14       Q    And the same thing.  When you're texting with

15  your co-workers, you're not texting them with a

16  telephone number paid for exclusively by your

17  employer; is that correct?

18       A    Can you rephrase the question please?  It

19  sounds like a double negative there.

20       Q    Sure.  So when you're texting with your

21  co-workers, you're -- you're texting them via a number

22  that is not paid for exclusively by your employer; is

23  that correct?

24       A    Yes.

25       Q    Do you have an email address you consider to
```



```
1    be your work email address?

2         A    Yes.

3         Q    And what is that work email address?

4         A    E-K-O-E-L-L-E-R at A-M-E-R-E-N dot com.

5         Q    And when you send emails through this email

6    address, do they have a set signature block?

7         A    No.  I'm sorry, can you rephrase that?  Are

8    you -- are you saying does my company -- does my

9    company set the signature block, or do I personally

10   set the signature block?

11        Q    I was just asking if -- if there was any

12   signature block when -- when you --

13        A    Okay.

14        Q    -- send emails from your work address?

15        A    Sure.  No problem.  Can you say the question

16   one more time, please?

17        Q    Sure.  So when you send work emails from your

18   work email address, is there a set signature block?

19        A    Yes.

20        Q    Is there a telephone number or multiple

21   telephone numbers that are listed in that signature

22   block?

23        A    Yes.

24        Q    And what is the number or what are the numbers

25   that are listed in that signature block?
```



```
 1      A    There is one number.  It is 314-554-2344.

 2      Q    Have you ever attended any conferences or

 3  trade shows for your job?

 4      A    Yes.

 5      Q    About how many have you been to?

 6           MR. STRAUSS:  Object to the form of the

 7  question.

 8           You may answer it, Mr. Koeller.

 9  BY MR. RULEY:

10      Q    You can answer.

11      A    Okay.

12      Q    And -- and let me just rephrase.  About how

13  many conferences have you attended for work?

14           MR. STRAUSS:  Same objection.

15           You may answer, Mr. Koeller.

16           THE WITNESS:  I would -- if I had to guess,

17  around 20.

18  BY MR. RULEY:

19      Q    And about how many trade shows have you

20  attended for work?

21           MR. STRAUSS:  Same objection.

22           You may answer.

23           THE WITNESS:  Can you define a trade show?  I

24  don't understand what that is versus conference.

25  BY MR. RULEY:
```



1      Q    Sure.  And -- and if you understand then --
2  well, strike that.
3           How many of those 20 conferences have you
4  attended in the past five years?
5      A    Maybe two.
6      Q    And you don't understand there to be any
7  difference between a conference and a trade show; is
8  that correct?
9      A    I don't quite know the definition of a trade
10  show, so I can't answer that.
11     Q    And what -- what were the two conferences that
12  you attended in the past five years for work?
13     A    I don't remember.
14     Q    Do you remember where they were located?
15     A    No.
16     Q    Do you recall if you had to travel for them?
17     A    No.
18     Q    No, you didn't have to travel, or you don't
19  recall if you had to travel?
20     A    I don't recall.
21     Q    Mr. Koeller, are you on any social media
22  platforms?
23     A    Yes.
24     Q    Which social media platforms are you on?
25     A    Facebook, LinkedIn, X, Snapchat, and Threads.



1     Q    Mr. Koeller, have you ever been arrested?

2     A    No.

3     Q    Have you ever been charged with any crimes?

4     A    No.

5     Q    Have you -- have you previously or are you

6 presently involved in any other litigation as a party

7 or a witness?

8     A    Yes.

9     Q    And about how many cases have you previously

10 been involved in or are presently involved in as a

11 party or a witness?

12    A    About five.

13    Q    Are you a plaintiff in all of those cases?

14    A    Yes.

15    Q    And can you tell me the -- the names of -- of

16 each of those -- the parties that you sued in each of

17 those cases?

18    A    I don't think I remember all of them.

19    Q    Can you tell me the ones you do recall?

20    A    Diamante was one.

21    Q    Can you say that name one more time for me?

22 I'm sorry.

23    A    I believe you pronounce it Diamante.

24    Q    Diamante?  Am I saying that correctly?

25    A    Yes.



```
 1      Q   Thank you.  My hearing sometimes is -- is not
 2   good.
 3          Do you remember any other -- the names of any
 4   other parties that you've brought lawsuits against?
 5      A   Not off the top of my head.
 6      Q   And when did that lawsuit against Diamante
 7   occur?
 8      A   I don't know.
 9      Q   Do you know what court that was in?
10      A   I don't know for sure.
11      Q   Do you recall what that case was about in --
12   in a nutshell?
13      A   It was a TCPA case.
14      Q   Were the allegations in that case similar to
15   -- to the allegations in this case?
16          MR. STRAUSS:  Object to the form of the
17   question.
18          You may answer it, Mr. Koeller.
19          THE WITNESS:  Yes.
20   BY MR. RULEY:
21      Q   And who represented you in that case?
22      A   Sam Strauss.
23      Q   And is that case ongoing, or has it been
24   resolved?
25      A   It has been resolved.
```



```
1        Q    And do you know if it's settled?

2        A    Yes, it is.

3        Q    And you don't recall the -- the names of any

4   of the other parties you've brought suit against; is

5   that correct?

6        A    That's correct.

7        Q    Have you ever been involved in any other

8   non-criminal legal proceedings such as an unemployment

9   hearing or any kind of administrative hearing?

10            MR. STRAUSS:  Object to the form of the

11  question.

12            You may answer it, Mr. Koeller.

13            THE WITNESS:  No.

14  BY MR. RULEY:

15       Q    Have you ever filed for bankruptcy?

16       A    No.

17       Q    Was anyone around when you allegedly received

18  the calls at issue in this suit?

19            MR. STRAUSS:  Object to the form of the

20  question.

21            You may answer it.

22            THE WITNESS:  No.

23  BY MR. RULEY:

24       Q    What documents did you review in preparation

25  for this deposition today?
```



```
 1      A    I reviewed -- we reviewed the class action

 2   Complaint, the discovery responses, and this

 3   deposition document.

 4      Q    The Notice of Deposition?

 5      A    Yes.

 6      Q    Did you review any documents produced by

 7   CybelAngel?

 8      A    I don't know what documents they produced.  I

 9   don't know is the answer.

10      Q    So -- so none to your -- none to your

11   knowledge.  That's fair.

12           Who have you spoken to in order to prepare for

13   this deposition?

14      A    Sam Strauss and members of his legal team.

15      Q    And I'm not going to ask you about the -- the

16   substance of any communications with Sam.  I -- I

17   don't want to know about that.

18           But can you tell me how many times you've

19   spoken with Sam or -- or members of his legal team?

20           MR. STRAUSS:  Object to the form of the

21   question.  Counsel, I'm not trying to be difficult.

22   Will you just define the range so that then I'll

23   withdraw my objection so it's clear what you're

24   asking.  Sorry.

25           MR. RULEY:  Sure.  Sure.
```



```
 1  BY MR. RULEY:
 2      Q   How many times did you speak with your
 3  attorneys to prepare for this deposition?
 4      A   I'm sorry.  Can you repeat the question?
 5      Q   Sure.  How many times did you speak with your
 6  attorneys to prepare for this deposition?
 7      A   Just to clarify.  When you say speak with, you
 8  mean verbally?  Or you're talking about communication?
 9      Q   Sure.  How many -- how many times did you
10  verbally speak with your attorneys to prepare for this
11  deposition?
12      A   Thank you.  Twice.
13      Q   And when did those meetings occur?
14      A   I'll have to look at the calendar real quick.
15  Friday, January 26th, and Sunday, January 28, 2024.
16      Q   And about how long did that meeting on Friday,
17  January 26th last?
18      A   About an hour.
19      Q   And about how long did that meeting on Sunday,
20  January 28th last?
21      A   Also about an hour.
22      Q   About how many times have you spoken with your
23  attorneys regarding this case outside of preparing for
24  your deposition?
25      A   Around one other time.
```



```
1              MR. RULEY:  Did we lose someone we needed?

2              THE VIDEOGRAPHER:  I'm still here.  It -- it

3   was -- it was my other -- my other computer.  I'm

4   still here, though.  I'm -- I'm on the backup.

5              MR. RULEY:  Okay.  No -- no worries.  Just

6   wanted to make sure because I -- I have carried on

7   before, and it has been to everyone's detriment.

8              THE VIDEOGRAPHER:  You can keep going.  I'm --

9   I'm still on.  I might come back on with the other

10  one.  I think I just ran out of power on that one.

11             MR. RULEY:  No worries.  Thank you.

12  BY MR. RULEY:

13     Q   Have you ever met with your attorneys

14  regarding this case in person?

15     A   The answer to that one is no.

16             THE WITNESS:  But I was wondering if we could

17  take a quick break.

18             MR. RULEY:  Sure.  No problem.  We can go off

19  record.

20             THE VIDEOGRAPHER:  Okay.  We're going -- we're

21  going off the record.  The time is approximately 11:59

22  a.m.

23             (A recess was taken.)

24             THE VIDEOGRAPHER:  We are back on the record.

25  The time is approximately 12:13 p.m.
```



```
 1  BY MR. RULEY:
 2      Q   Mr. Koeller, aside from your lawyers, have you
 3  spoken with anyone else about this lawsuit?
 4      A   No.
 5      Q   You haven't spoken to anyone in your family
 6  about it?
 7      A   No.
 8      Q   Okay.  I'm going to introduce --
 9          MR. STRAUSS:  Hey, James, before you ask your
10  next question or introduce an exhibit, can we go off
11  the record just for one second?  I have a question to
12  ask you.
13          MR. RULEY:  Sure.
14          THE VIDEOGRAPHER:  Okay.  We're going off the
15  record.  The time is approximately 12:14 p.m.
16          (A discussion was held off the record.)
17          THE VIDEOGRAPHER:  We are back on the record.
18  The time is approximately 12:15 p.m.
19          MR. RULEY:  Okay.  I'm going to introduce what
20  we're going to mark as Exhibit 1, and I will just
21  share that on the screen, so give me one second.
22          (Exhibit 1 was marked for identification.)
23  BY MR. RULEY:
24      Q   Mr. Koeller, can -- can you see the document
25  that I'm sharing on my screen?
```



```
 1      A    Yes.
 2      Q    Is that large enough for you to see?  Do you
 3 need me to make it a little bigger?
 4      A    It's perfect.
 5      Q    Okay.  Do you recognize this document?
 6      A    Yes.
 7      Q    And what is it?
 8      A    It's the Class Action Complaint.
 9      Q    And did you review this document before it was
10 filed?
11      A    Yes.
12      Q    And are the factual statements in this
13 document accurate to the best of your knowledge?
14      A    Yes.
15      Q    And do you know how many times you reviewed
16 this Complaint before it was filed?
17      A    At least twice.
18      Q    And do you know approximately how much time
19 you spent reviewing it?
20      A    It took about an hour.
21      Q    I'm going to stop sharing this for now.
22           Mr. Koeller, why did you bring this lawsuit?
23      A    Illegal tele -- telemarketing calls are very
24 intrusive and disruptive for me, especially in my line
25 of business.  I have to have -- have a lot of focus in
```



```
 1   my work.

 2        Q   And what is it that you contend that

 3   CybelAngel did that violated the Telephone Consumer

 4   Protection Act?

 5              MR. STRAUSS:  Object to the form of the

 6   question.

 7              You may answer it, Mr. Koeller.

 8              THE WITNESS:  They called a non-business

 9   number that is on the National Do Not Call List.

10   BY MR. RULEY:

11        Q   And what is it that you contend that

12   CybelAngel did that violated Missouri's Telemarketing

13   Do Not Call List law?

14              MR. STRAUSS:  Object to the form of the

15   question.

16              You may answer it.

17              THE WITNESS:  They called a number that's on

18   the Missouri Do Not Call List.

19   BY MR. RULEY:

20        Q   Had you ever heard of CybelAngel prior to

21   receiving the communications you allegedly received in

22   this suit?

23        A   No.

24        Q   And you've never talked to anyone else who's

25   received a call from CybelAngel; right?
```



```
 1              MR. STRAUSS:  Object to the form of the
 2    question.
 3              You may answer it.
 4              THE WITNESS:  Can you repeat the question,
 5    please?
 6    BY MR. RULEY:
 7       Q   Sure.  You've never talked to anyone else
 8    who's received a call from CybelAngel; right?
 9              MR. STRAUSS:  Object to the form of the
10    question.
11              You may answer it.
12              THE WITNESS:  Yes.
13    BY MR. RULEY:
14       Q   This case has been pending since about March
15    of 2023.  Do you know what events have happened in
16    this case since then?
17              MR. STRAUSS:  Object to the form of the
18    question.
19              You may answer.
20              THE WITNESS:  Tech (phonetic) and I reviewed a
21    class Complaint.  Recently we a did discovery, a
22    respond to discovery document.  And now I'm
23    participating -- participating in this deposition
24    that's in a discovery phase.
25    BY MR. RULEY:
```



```
 1      Q    Anything else?

 2           MR. STRAUSS:  Same objection.

 3           You may answer.

 4           THE WITNESS:  No.

 5           MR. RULEY:  I'm going to introduce what we're

 6  going to mark as Exhibit 2, and I'm going to share

 7  this on my screen.

 8           (Exhibit 2 was marked for identification.)

 9  BY MR. RULEY:

10      Q    Mr. Koeller, can you see the document that I'm

11  sharing on my screen?

12      A    Yes.

13      Q    Have you seen this document before?

14      A    Yes.

15      Q    And what is it?

16      A    I call this a discovery document.

17      Q    And these are your responses to CybelAngel's

18  discovery requests to you; is that correct?

19      A    Yes.

20      Q    And how long did you spend preparing your

21  responses?

22      A    I believe around two to three hours after

23  multiple iterations.

24      Q    Did you confirm that everything in this

25  document is true and accurate to the best of your
```



```
 1   knowledge?

 2       A    Yes.

 3       Q    And I'm going to scroll through this document.

 4   And can you confirm this is your electronic signature?

 5       A    I'm sorry, was there anything after the word

 6   signature?

 7       Q    (Audio interruption) believe that it is true

 8   and correct?

 9            THE WITNESS:  Is he cutting out for anybody

10   else?

11            MR. RULEY:  I can say it again.

12            THE COURT REPORTER:  Sorry.

13            THE VIDEOGRAPHER:  Yeah.

14            THE COURT REPORTER:  You're breaking up.

15            THE VIDEOGRAPHER:  Yeah, Mr. Ruley, you're

16   breaking up.  Can you just repeat what you just said?

17   I think it's because you're looking away maybe.  I

18   don't know.

19            MR. RULEY:  Sure.

20   BY MR. RULEY:

21       Q    (Audio interruption) so following the -- the

22   verification on this document?

23            THE WITNESS:  I don't know if you're breaking

24   up again.  I didn't hear a question.

25            MR. RULEY:  Can you all hear me?
```



```
 1              MR. STRAUSS:  Yeah, James -- James, we lost
 2    you for a minute, but now you seem clear.  So if you
 3    start your question over again, I think we're in a
 4    good spot.
 5              MR. RULEY:  Okay.  Sorry about that.  Third
 6    time is the charm, as they say.
 7    BY MR. RULEY:
 8       Q   So Mr. Koeller, can you just confirm for me
 9    that -- that this is your signature here following the
10    verification on this document?
11       A   Yes, it's my signature.
12       Q   I'm going to stop sharing this.
13              Mr. Koeller, do you know the difference
14    between an individual and a class action lawsuit?
15              MR. STRAUSS:  Object to the form of the
16    question.
17              You may answer it, Mr. Koeller.
18              THE WITNESS:  I think so.
19    BY MR. RULEY:
20       Q   And what is a class action lawsuit?
21              MR. STRAUSS:  Same objection.
22              You may answer, Mr. Koeller.
23              THE WITNESS:  To the best of my knowledge,
24    it's when a company has broken the law for multiple
25    individuals.
```



```
 1   BY MR. RULEY:
 2       Q   And are you bringing this case as an
 3   individual action or a class action?
 4       A   Class action.
 5       Q   And what do you understand your role to be in
 6   this class action?
 7       A   I am a class action representative.
 8       Q   And what's your understanding of the duties
 9   that come with that role of class representative?
10       A   I believe the duties are class action
11   representatives respond to discovery, participate in
12   depositions, and if required, appear in court.
13       Q   And what do you understand your lawyer's role
14   in this case to be?
15           MR. STRAUSS:  Object to the form of the
16   question.
17           You may answer it, Mr. Koeller.
18           THE WITNESS:  I -- I don't know exactly.  If I
19   had to guess, file the lawsuit and represent the
20   class.  I'm sorry, not represent the class, but help
21   the class bring the lawsuit in front of court.
22   BY MR. RULEY:
23       Q   And why did you seek counsel regarding the
24   contact you allegedly received from CybelAngel?
25       A   As I mentioned before, unsolicited marketing
```



1  telephone calls are very disruptive and intrusive for

2  me and others.  And that inspired me to bring a

3  lawsuit since I am on the Do Not Call List of the

4  Missouri National Do Not Call List.

5       Q    And how did you find your lawyers?

6       A    I have worked with them in the past.

7       Q    Can you identify for me all of the telephone

8  numbers that you regularly use?

9            MR. STRAUSS:  Object to the form of the

10  question.

11            You may answer it.

12            THE WITNESS:  314-270-3785.  That's one

13  number.  Second number is 314-602-3170.  And the third

14  number is 314-554-2344.

15  BY MR. RULEY:

16       Q    If I refer to that -- that first number you

17  listed, the 314-270-3785 number, as the 3785 number,

18  you'll know that I'm referring to that whole telephone

19  number; is that correct?

20       A    Yes.

21       Q    And then if I refer to that 314-602-3170

22  number as the 3170 number, you'll know that I'm

23  referring to that whole telephone number; is that

24  correct?

25       A    Yes.



 1      Q    And you can guess my next question.  If I
 2  refer to that 314-554-2344 number just by the last
 3  four digits of 2344, you'll know that I'm referring to
 4  the whole telephone number; is that correct?
 5      A    Yes.
 6      Q    When you receive calls on the 3785 number,
 7  what device do those calls ring through to?
 8      A    My home phone.
 9      Q    And when you say your home phone, is that a --
10  a number that is tethered to your house like a -- like
11  a land line?
12      A    Yes.
13      Q    And when you receive calls on the 2344 number,
14  what device do those calls ring through to?
15      A    Through Teams at my work computers.
16      Q    Is there a separate device that that 2344 four
17  number goes to, or just the -- the Teams, the -- the
18  Microsoft Teams application?
19           MR. STRAUSS:  Object to the form of the
20  question.
21           You may answer it.
22           THE WITNESS:  It's the application.
23  BY MR. RULEY:
24      Q    And when you receive calls on the 3170 number,
25  what device do those calls ring through to?



1       A    My personal cell phone.

2       Q    How long have you used the 3785 number?

3       A    Can you repeat the question?  You cut out a

4    little bit.

5       Q    Oh, I'm sorry about that.  How long have you

6    used the 3785 number?

7       A    I believe about nine years, when I moved into

8    this house.

9       Q    And how long have you used the 2344 number?

10      A    Since January 2, 2001.

11      Q    Did you say 2001 or -- or '21?

12      A    Yes.

13      Q    2001.

14      A    2001, yep.  The year.

15      Q    And is that when you began working at -- at

16    Ameren?

17      A    Yes.

18      Q    And how long have you been using the 3170

19    number?

20      A    I believe I received that number when I was

21    around 18 years old.

22      Q    And who's your service provider for the 3170

23    number?

24      A    Magic Jack.

25      Q    Sorry.  Can you say that one more time?



```
 1      A    Yeah.

 2      Q    I don't know if I cut out.  Can you say that

 3  provider one more time?

 4      A    Yes.  The provider with the 3785 number is

 5  Magic Jack.

 6      Q    Thank you.  And do you know who the service

 7  provider is for your 3170 number?

 8      A    AT&T.

 9      Q    And do you know who the service provider is

10  for the 2344 number?

11      A    No.

12      Q    But you only use that number for -- for Teams

13  calls; is that correct?

14      A    Yes.

15      Q    And how long have you been using that number

16  exclusively for Teams calls?

17      A    I don't know exactly.  I think when the

18  pandemic started.

19      Q    Who pays the phone bill on the 3785 number?

20      A    I do.

21      Q    And how -- and who pays the phone bill on the

22  3170 number?

23      A    I do.

24      Q    And do you know -- do you know if there is a

25  phone bill for the 2344 number?
```



```
 1        A    No.

 2        Q    Okay.   I'm going to pull up Exhibit 2 again.

 3   Give me one moment.   Can you see the document that I'm

 4   sharing?

 5        A    Yes.

 6        Q    And I'm going to read here under Interrogatory

 7   Number 15.   It says:   For the subject telephone number

 8   -- and I'll represent to you that -- that that is the

 9   3170 number -- identify who pays the bill for the

10   service to that number, including any reimbursement to

11   the original payor, for each month from January 1,

12   2020, to the present.

13             Did I read that correctly?

14        A    Yes.

15        Q    And I'm going to scroll down to your response,

16   which says, in part:   Plaintiff pays for the phone

17   account.   Plaintiff does not receive reimbursement

18   specifically for that number.   However, plaintiff

19   receives a stipend from his employer to ensure that he

20   is available to address emergency issues at work

21   should an emergent event arise outside working hours.

22             Did I read that portion of the response

23   correctly?

24        A    Yes.

25        Q    And can you just explain for me how that
```



1  stipend works?

2          MR. STRAUSS:  Object to the form of the

3  question.

4          You may answer it, Mr. Koeller.

5          THE WITNESS:  My employee (sic) reimburses me

6  a portion of my cell phone bill to be available for

7  critical cyber security incidents that happen outside

8  of working hours.

9  BY MR. RULEY:

10     Q    And do you receive that stipend on a monthly

11  basis?

12     A    Yes.

13     Q    And how much is that stipend?

14     A    I believe it's  35.00.

15     Q    And that stipend is for your 3170 number; is

16  that correct?

17          MR. STRAUSS:  Object to the form of the

18  question.

19          You may answer it.

20          THE WITNESS:  Yes.

21  BY MR. RULEY:

22     Q    Because if necessary, you can be contacted

23  about your work at this 3170 number; correct?

24     A    Yes.

25     Q    Has that ever happened?



```
 1      A   Yes.

 2      Q   And about how many times?

 3      A   Around a couple times a year.

 4      Q   And that's because your work couldn't reach

 5  you at the 2344 number, at least outside of working

 6  hours; is that correct?

 7          MR. STRAUSS:  Object to the form of the

 8  question.

 9          You may answer it, Mr. Koeller.

10          THE WITNESS:  Yes.

11  BY MR. RULEY:

12      Q   When you receive -- you -- you testified

13  earlier that you receive phone calls from your

14  co-workers; is that correct?

15      A   Yes.

16      Q   Do your co-workers ever call you at the 3170

17  number?

18      A   Yes.

19      Q   And do they text you at the 3170 number?

20      A   Yes.

21      Q   Do you take a tax deduction for any of these

22  telephone numbers -- well, strike that.

23          Do you take a tax deduction for the 3170

24  number?

25      A   I don't know.
```



```
 1      Q    You don't know if you've ever taken a -- a tax
 2  deduction for that 3170 number?
 3      A    No.  I'm not well-versed in taxes.
 4      Q    Do you file your own taxes?
 5      A    Sorry.  Can you clarify?  Are you asking if I
 6  file them myself or through a tax agency?
 7      Q    That's correct.
 8      A    I file through a tax company.
 9      Q    And what tax company do you use?
10      A    Bussen and McLeod.
11      Q    Is -- is Bussen, B-U-S-S-E-N?
12      A    I believe so.
13          MR. RULEY:  I'm going to introduce another
14  exhibit that I'll mark as Exhibit C.  Let me stop
15  sharing.
16          (Exhibit C was marked for identification.)
17  BY MR. RULEY:
18      Q    Can you see the document I'm sharing on my
19  screen, Mr. Koeller?
20      A    Yes.
21      Q    And can you tell what this document appears to
22  be?
23      A    I don't know exactly.
24      Q    Does this here at the top of the screen appear
25  to be the -- the case caption for this case, Edward J.
```



1  Koeller versus CybelAngel USA, Incorporated?

2      A   Yes.

3      Q   And here it says:  Subpoena to produce

4  documents, information, or objects, or to permit

5  inspection of premises in a civil action.

6          Did I read that correctly?

7      A   Yes.

8      Q   And here in -- in the to line, the subpoena

9  appears to be directed at AT&T; is that correct?

10     A   Yes.

11     Q   And have you seen this document before, Mr.

12  Koeller?

13     A   It doesn't look familiar based on the -- what

14  I'm seeing, just this title page.

15     Q   Understood.  And -- and I'll represent to you

16  that this document was produced in discovery by

17  CybelAngel here in the bottom right-hand corner.  And

18  I know this is hard when -- when we're screen sharing

19  because you -- you can only see the part of the

20  document I'm on.  And -- and so if you want me to --

21  to scroll up or down, please let me know.  But you can

22  see here this numbering here, CybelAngel 33.

23          I'm scrolling down to the documents that are

24  -- were requested by CybelAngel.  The request is for

25  all documents concerning the account or accounts



 1   associated with 314-602-3170 from January 1, 2020, to

 2   July 31, 2023.

 3          Did -- did I read that part of the request

 4   correctly?

 5      A   Yes.

 6      Q   And that 3170 number is the number at issue in

 7   this suit; is that correct?

 8          MR. STRAUSS:  Object to the form of the

 9   question.

10          You may answer it.

11          THE WITNESS:  Yes.

12   BY MR. RULEY:

13      Q   Is that -- that 3170 number is -- is your

14   telephone number; correct?

15      A   Yes.

16      Q   And scrolling down here to -- to Section B of

17   the request, so it includes logs, cataloging, all

18   inbound calls placed to and outbound calls placed from

19   314-602-3170, including, but not limited to, details

20   for each call, such as the date, time, duration, and

21   associated inbound or outbound numbers.

22          Did I read that correctly?

23      A   Yes.

24      Q   I am going to scroll down to another page.  So

25   I'll represent to you that this is an AT&T records key



1  that was produced by AT&T in response to this

2  subpoena.  And what I note here, this ET, elapsed

3  time, this is a column or field name.  And its

4  description is duration of the transaction.  Duration

5  is in MMSS.

6          Did I read that correctly?

7      A   Yes.

8      Q   I'm going to scroll down, and I'll represent

9  to you that these are phone records produced by AT&T

10 in response to this discovery request -- to this

11 subpoena, excuse me.  And I'll direct your attention

12 here to item 117.  And if you'll look across, you can

13 see at the top of the screen that there is a category

14 heading of these calls.

15          And can you see here under the terminating

16 number in 117, can you read what that number is?

17     A   1-314-602-3170.

18     Q   And is that your number?

19     A   Yes.

20     Q   And can you read this number for me here under

21 the originating number column?  It's 117, an

22 originating number.  Can you read that number for me?

23     A   1-314-339-1025.

24     Q   And do you know what that 31 -- 1-314-339-1025

25 number is?



```
1        A    No.
2        Q    You don't know one way or the other what that
3   number is; correct?
4        A    Correct.
5        Q    So if I represented to you that our research
6   shows that number is associated with your employer,
7   Ameren, you wouldn't dispute that; right?
8             MR. STRAUSS:  Object the form of the question.
9             You may answer.
10            THE WITNESS:  What exactly is the question?
11  BY MR. RULEY:
12       Q    Sure.  So if I represented to you that our
13  research shows that number is associated with your
14  employer, Ameren, you wouldn't dispute that; right?
15            MR. STRAUSS:  Object to the form of the
16  question.
17            You may answer it.
18            THE WITNESS:  I still don't quite
19  understand the question.
20  BY MR. RULEY:
21       Q    Sure.  So you don't know one way or the other
22  what that 1-314-339-1025 number is; correct?
23       A    That's correct.
24       Q    So if I represented to you that the -- our
25  research shows that number is associated with your
```



```
 1   employer, you wouldn't dispute that; right?

 2       A   I haven't seen the research.

 3           MR. STRAUSS:  Object to the form of the

 4   question.  I'm sorry.  Object to the form of the

 5   question.

 6           You may answer.

 7           THE WITNESS:  I haven't seen the research.

 8   BY MR. RULEY:

 9       Q   So you don't know one or the other; correct?

10       A   That's correct.

11           MR. STRAUSS:  Object to the form.  The

12   question's been answered.

13   BY MR. RULEY:

14       Q   Let me direct you down to line 126 on this

15   page.  And same thing here under this terminating

16   number column.  Can you read what this number is here

17   between 126 and the terminating number?

18       A   Between -- I'm sorry, can you rephrase that?

19       Q   Yeah, sure.  The -- the number here across

20   from 126 on the 126 row and down on the terminating

21   number column.

22       A   1-314-602-3170.

23       Q   And -- and that 3170 number is -- is your

24   number; correct?

25       A   Yes.
```



1      Q    And can you read this number here, again, on
2  that same row 126 under the originating number column?
3      A    1-217-625-6899.
4      Q    And do you know what that 1-217-625-6899
5  number is?
6      A    No.
7      Q    You don't know one -- one way or -- or the
8  another -- one way or another what that number is;
9  correct?
10     A    That's correct.
11     Q    I'm going to scroll down to the next page at
12 line 1546.  And under the originating number column
13 and the 1546 row, is that number ending in 3170 your
14 telephone number?
15     A    Yes.
16     Q    And this number in the terminating number
17 column and the 1546 row, can you read that number for
18 -- for us?
19     A    1-314-206-0662.
20     Q    And do you know what that 1-314-206-0662
21 number is?
22     A    Yes.
23     Q    And what is that number?
24     A    It is Ameren's digital command center number
25 or network operations center.



1      Q    And -- and what is a digital command center?

2      A    It's a team that keeps the network running and

3  handles incidents at Ameren.

4      Q    And so you'd agree that these records show you

5  placed a phone call from your 3170 number to an Ameren

6  number; is that correct?

7      A    Yes.

8      Q    Okay.  Let me direct you to this next page

9  and line 9833.  And is this originating number here

10  going across from 9833 and going down from the

11  originating number column -- is this 3170 number --

12  that's your number; correct?

13      A    Yes.

14      Q    And can you read this number in the

15  terminating number column on that 9833 row?

16      A    It is 1-314-554-4357.

17      Q    And do you know what that 1-314-554-4357

18  number is?

19      A    Yes.

20      Q    And what is that number?

21      A    That is the Ameren help desk.

22      Q    And so you'd agree that these records reflect

23  that you called the Ameren help -- help desk on your

24  3170 number?

25      A    Yes.



```
 1        Q    Do you know any other Ameren telephone numbers

 2   off the top of your head?

 3        A    No.

 4             MR. RULEY:  Let's go ahead and -- and take --

 5   let's go ahead and take a ten-minute break.  We can go

 6   off the record.

 7             THE VIDEOGRAPHER:  Okay.  We're going off the

 8   record.  The time is approximately 1:06 p.m.

 9             (A recess was taken.)

10             THE VIDEOGRAPHER:  We are back on record.  The

11   time is approximately 1:16 p.m.

12   BY MR. RULEY:

13        Q    Mr. Koeller, you identified a call that you

14   placed to the Ameren help desk from your 3170 number;

15   is that correct?

16        A    Yes.

17        Q    And when you called the Ameren help desk, you

18   were calling about work; correct?

19        A    Yes.

20        Q    And then you also identified a call that you

21   placed to the Ameren help desk from your -- from you

22   -- sorry, to -- to the -- strike that.  It has not

23   been that long a day.  All right.

24             You identified a call that you placed to

25   Ameren's digital command center from your 3170 number;
```



```
 1  is that correct?
 2       A   Yes.
 3       Q   And when you called Ameren's digital command
 4  center, you were calling about work; correct?
 5       A   Yes.
 6       Q   And you mentioned that you received a $35 a
 7  month stipend so that Ameren could access you out --
 8  could access you outside of normal working hours at
 9  your 3170 number; is that correct?
10            MR. STRAUSS:  Object to the form of the
11  question.
12            You may answer it.
13            THE WITNESS:  Yes.
14  BY MR. RULEY:
15       Q   And how long have you received that 35.00 a
16  month stipend?
17       A   I don't know.
18       Q   Has it been years?
19       A   That's -- that's pretty broad.  You want --
20  it's been more than one year.
21       Q   Has it been more than five years?
22       A   Yes.
23       Q   All right.
24            MR. RULEY:  Well, that is all that I have
25  unless your Counsel have question -- has -- has
```



```
 1  questions for you.  Sam?

 2           MR. STRAUSS:  I do not have any questions.  Is

 3  it -- would -- do you want our transcript orders on

 4  the record?  And, if so, we're happy to place that.

 5  Some reporters won't want that.  Is that a priority,

 6  Linda?

 7           THE COURT REPORTER:  As long as I have it on

 8  video -- I mean, sorry, on audio it doesn't matter

 9  whether it's on the record.  So it's up to you.

10           MR. STRAUSS:  Okay.  Great.  Great.  Well,

11  then, James, shall we go off the record?

12           MR. RULEY:  Yep.  Let's go off the record.

13           THE VIDEOGRAPHER:  Okay.  This concludes the

14  video deposition of Edward J. Koeller -- or Koeller,

15  I'm sorry.  We're going off the record, and the time

16  is approximately 1:19 p.m.

17           (The deposition was concluded at 1:20 p.m.)

18

19

20

21

22

23

24

25                    D I S C L O S U R E
```



1

2  STATE OF GEORGIA )              DEPOSITION OF:

3  COUNTY OF HOUSTON
                     )              EDWARD KOELLER
4       Pursuant to Article 8.B. of the Rules and

5  Regulations of the Board of Court Reporting of the

6  Judicial Council of Georgia, I make the following

7  disclosure:

8       I am a Georgia Certified Court Reporter.  I am

9  here as an independent contractor.

10      I was contacted by the offices of Esquire

11 Deposition Solutions to provide court reporting

12 services for this deposition.  I will not be taking

13 this deposition under any contract that is prohibited

14 by O.C.G.A. 15-14-7(a) and (b).

15      I have no written contract to provide reporting

16 services with any party to the case, any counsel in

17 the case, or any reporter or reporting agency from

18 whom a referral might have been made to cover this

19 deposition.  I will charge my usual and customary

20 rates to all parties in the case.

21

22      Linda P. Gove

23      Certified Court Reporter

24      Certificate No.:  4716-1949-7728-4096

25                    C E R T I F I C A T E



1

2  STATE OF GEORGIA )

3  COUNTY OF HOUSTON
                       )
4        I, Linda P. Gove, hereby certify that the

5  foregoing deposition was taken down as stated in the

6  caption, and the questions and the answers thereto

7  were reduced to typewriting by me; that the foregoing

8  pages are a true, correct, and complete transcript of

9  the evidence given by the witness, EDWARD KOELLER, who

10  was first duly sworn by me; that I am not a relative,

11  employee, attorney, or counsel of any of the parties;

12  nor am I financially interested in this action.

13        I further certify that I was hired to cover this

14  reporting incident by Esquire Deposition Solutions and

15  that no contract exists between the parties

16  individually, anyone involved in this matter, and

17  myself.

18        This the 10th day of February 2024

19        *Linda Gove*

20

21        Linda P. Gove

22        Certified Court Reporter

23        Certificate No.: 4716-1949-7728-4096





























